| | |
|---|---|
| **DIANA FLEMING,** | Civ. No. 16-3382 (KM) (MAH) |
| **Plaintiff,** | |
| | **OPINION** |
| **v.** | |
| **ASSOCIATED CREDIT SERVICES, INC.,** | |
| **Defendant.** | |

## KEVIN MCNULTY, U.S.D.J.:

Diana Fleming sues Associated Credit Services, Inc. ("ACS"), over a series of allegedly harassing phone calls that occurred from September 2015 to December 2015, which she claims were harassing in nature. These were dunning calls related to Ms. Fleming's unpaid electric bills; the power company had assigned the debt to ACS for collection. Approximately sixteen calls are alleged; two involved actual conversation between a representative of ACS and Ms. Fleming. Ms. Fleming now brings claims under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* and the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227. ACS has moved for summary judgment. For the reasons explained in this opinion, the summary judgment motion is granted in part and denied in part.

## I.  Summary[1]

On or about September 2015, Ms. Fleming, a customer of Jersey Central Power & Light Company ("the power company"), experienced some financial difficulties and began to fall behind on her utility bill payments to the power company. (DSMF ¶¶ 1–2; PSMF ¶¶ 1–2.) Sometime between January and March 2015, she agreed to a payment plan with the power company but that payment plan "fell through." (DSMF ¶¶ 3-4; PSMF ¶¶ 3-4.) She was also experiencing some difficulty with the payment of other bills. (DSMF ¶ 5; PSMF ¶ 5.) On September 2, 2015, the power company placed the debt with ACS for collection. (PSMF ¶ 41; DCSMF ¶ 41.)

Sometime around the end of July 2015, Ms. Fleming claims she received a call about her bill. (DSMF ¶ 10; PSMF ¶ 10.) By her description, the caller was male, but she does not know the name of the individual, how he identified himself, or for what company he worked. (DSMF ¶¶ 11–12; PSMF ¶¶ 11–12.)

---

[1]    For ease of reference, I will cite to the following items as:

| | | |
|---|---|---|
| Cplt.  = | Complaint (ECF no. 1) | |
| Ans.  = | Answer (ECF no. 3) | |
| Def. Br.  = | Memorandum of Law in Support of Motion for Summary Judgment by Defendant (ECF no. 24-3) | |
| Pl. Opp.  = | Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (ECF no. 27) | |
| Def. Reply  = | Defendant's Brief in Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (ECF no. 31) | |
| DSMF  = | Defendant's Local Rule 56.1 Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (ECF no. 24-2) | |
| PSMF  = | Plaintiff's Response and Counterstatement of Fact to Defendant's Local Rule 56.1 Statement of Undisputed Material Facts (ECF no. 26) | |
| DCSMF  = | Defendant's Response to Plaintiff's Statement of Additional Undisputed Material Facts (ECF no. 31-1) | |

Ms. Fleming states that she presumed that this man worked for either the power company or a debt collector working on its behalf. (PSMF ¶ 11; DSMF ¶ 11.) She was driving at the time and requested that the man call back later or give her a number she could use to call him back. (*Id.*)

On another phone call about the debt on September 15, 2015,[2] Ms. Fleming spoke with a man and a woman from ACS. (DSMF ¶¶ 13–14; PSMF ¶¶ 13–14.) The call began with the male representative, who inquired about her ability to pay her debt. (DSMF ¶¶ 16–17; PSMF ¶¶ 16–17.) She told the male representative that she could not afford to pay the debt because she had lost her job, had no money, had just come out of a domestic violence situation, was living with someone else, and was struggling to feed her kids. (PSMF ¶ 42; DCSMF ¶ 42.) The male ACS representative then transferred Ms. Fleming to a female supervisor. (PSMF ¶ 44; DCSMF ¶ 44.) The supervisor asked Ms. Fleming if she was receiving assistance from the state or some other source and told Ms. Fleming about sources she could turn to for assistance. (DSMF ¶ 28; PSMF ¶ 28.) Ms. Fleming told the supervisor that she was not aware of any government or charitable programs that would be able to help her. (PSMF ¶ 45; DCSMF ¶ 45.) Towards the end of the conversation, the supervisor said, "Good luck. I might call again in the future, but I wish you good luck. Okay?," to which Ms. Fleming responded, "Okay. Thank you so much." (DSMF ¶ 28; PSMF ¶ 28.)

Ms. Fleming recalls another conversation with an ACS representative about her debt. She states that it occurred sometime after the call on September 15, 2015, but she could not remember who called or how long the conversation lasted. (DSMF ¶ 19; PSMF ¶ 19.) She also could not find this

---

[2]     There is some minor confusion about the precise date. ACS, in both its moving brief and its statement of material facts, places this call on September 14 rather than September 15. (*See, e.g.,* DSMF ¶ 21; Def. Br. at 5.) Ms. Fleming suggests that this is merely a typographical error on the part of ACS. (*See, e.g.,* PSMF ¶ 21.) In its reply brief, ACS begins to refer to the call as occurring on September 15. (*See, e.g.,* Def. Reply at 9.) As it seems to make no substantive difference, I will assume for the present that a date of September 15, 2015 was intended by both sides.

conversation in her call records. (DSMF ¶¶ 20; PSMF ¶¶ 20.) At her deposition, however, Ms. Fleming testified that she told the ACS representative during this phone conversation "to stop calling because [her] current situation did not change" since the last time she spoke to an ACS representative on September 15, 2015. (DSMF ¶ 19; PSMF ¶ 19.)

On December 7, 2015, counsel for Ms. Fleming sent a letter to ACS stating that they would be representing her and directing ACS to have no further direct communication with her. Counsel also explicitly revoked Ms. Fleming's consent to be called by ACS on her cell phone number. (DSMF ¶ 25; PSMF ¶ 25.) ACS has not directly contacted Ms. Fleming since receiving that letter. (DSMF ¶ 26; PSMF ¶ 26.) Ms. Fleming also stipulated at her deposition that she did not sustain any actual damages as a result of the phone calls. (DSMF ¶ 27; PSMF ¶ 27.)

According to ACS's call log, after the September 15, 2015 phone conversation Ms. Fleming received 14 more phone calls from ACS on the following dates: September 22, September 26, October 1, October 8, October 15, October 20, October 26, October 30, November 4, November 12, November 16, November 21, December 1, and December 3, 2015. (PSMF ¶ 47; DCSMF ¶ 47.) Ms. Fleming did not recall answering any of those calls (unless one of them was the call to which she could not attach a specific date). Nevertheless, she found them "annoying, harassing, and invasive." (Id.; PSMF ¶ 22.) ACS's call logs back up Ms. Fleming's statement that she spoke to an ACS representative on September 15, 2015. The logs do not corroborate the existence of the other two calls in which she says she actually spoke to a representative (i.e., the call in July 2015 and the one on some unspecified date after September 15, 2015).

ACS made all calls to Ms. Fleming that appear in the call log using the LiveVox Human Call Initiator ("HCI") System. (DSMF ¶ 29; PSMF ¶ 29.) Ms. Fleming and ACS disagree over the exact makeup and capabilities of the LiveVox HCI system.

According to ACS, the HCI system requires human intervention before a call can be initiated and that it is not capable of automated or predictive

4

dialing. (DSMF ¶¶ 31–32.) Further, it describes HCI as a distinct outbound dialing system that is separate from the other dialing systems used by LiveVox at the hardware and software level. (DSMF ¶ 33.) ACS says that HCI uses a set of servers exclusively dedicated to HCI calls and cannot launch automated calls. (*Id.*) ACS does not install any LiveVox system on its own computers. (DSMF ¶ 33; PSMF ¶ 33.) To place a call using the HCI system, a "clicker agent" must physically "click on" or press the enter key to initiate a call to a particular number, and there must be a "closer agent" who is available to take the call. (DSMF ¶ 34.) The "clicker agent" has the ability to determine how often calls are made based on the availability of a "closer agent." (*Id.*) HCI allegedly does not have the capacity to auto-dial, and none of its features can be modified, activated, deactivated, or otherwise altered to enable it to auto-dial. (*Id.* ¶ 35.) HCI cannot produce numbers to be dialed using a random or sequential number generator. (DSMF ¶ 36; PSMF ¶ 36.) Nor does it use an artificial or pre-recorded voice. (DSMF ¶ 37; PSMF ¶ 37.)

According to Ms. Fleming, the distinctions that ACS draws between HCI and an autodial system are not meaningful. ACS has a computer file of hundreds or thousands of account numbers with phone numbers. Those numbers, says Ms. Fleming, are loaded into "campaign database" software. That software in turn uses preprogrammed criteria to sort the phone numbers and send them to one or more of four LiveVox servers for dialing: the Automated Server; the HCI server; the Preview-All Server; or the Manual Server. (PSMF ¶ 48; *see also* PSMF ¶ 49.) When the combined system made up of the campaign database and the four servers is used, calls can be launched using the Automated Server where the computer dials each call from the stored list. (PSMF ¶ 50.) Calls can also be routed by the campaign database to the HCI server, where the system selects the next telephone number to call from the phone numbers stored in its database, where it displays each number one-at-a-time on a screen for a "clicker agent," whose sole job is to push a button that dials the number chosen by the computer. (PSMF ¶ 51.) In the HCI mode, the "clicker agent" does not have a choice of which number to call but merely

selects the number presented to him or her. (PSMF ¶ 52.) The agent does not have the option to skip the number and go on to another call or to decline the call; the agent must either launch the call or log out of the system and stop working altogether. (PSMF ¶ 53; *see also* PSMF ¶ 54.) Under either the Automated or HCI server, there is no person on the phone line when the call is made, and the call is only transferred to a live agent to handle the call if the computer system detects that a human voice has answered. (PSMF ¶ 55.)

In June 2016, Ms. Fleming brought suit against ACS, making claims under the TCPA and FDCPA. ACS now moves for summary judgment on several grounds. First, it argues that Ms. Fleming cannot show that the allegedly harassing calls were placed without her consent.[3] (Def. Br. at 11.) Second, it argues that Ms. Fleming cannot show that the calls were placed using an autodialer as defined under the TCPA. (*Id.* at 12.) Third, it argues that Ms. Fleming has not shown a sufficient number of phone calls to warrant relief under the FDCPA. (*Id.* at 16–19.)

## II.   Discussion

### a. Standard of Review

Fed. R. Civ. P. 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty.*

---

[3]      Under the provision of the TCPA in question, consent of the debtor to receive the calls is a complete defense to an alleged violation. *See* 47 U.S.C. § 227(b)(1)(A)(iii) (making it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any . . . cellular telephone service . . . unless such call is made solely to collect a debt owed to or guaranteed by the United States." (emphasis added)). Because I find that ACS's HCI system is not an autodialer under the TCPA and grant summary judgment on that basis, I need not reach the defendant's argument regarding consent. *See infra* II.c.

*of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth the types of evidence on which a nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

### b. Standing

Although the parties do not press the issue of standing, I am obliged to consider it. *See Lewis v. Alexander*, 685 F.3d 325, 338 n.10 (3d Cir. 2012). ACS alleges that Ms. Fleming "has stipulated through counsel that she did not suffer any personal or actual damages." (Def. Br. at 16 (adding that "she received no medical or psychological treatment"); DSMF ¶ 27.) Ms. Fleming counters that though she "has suffered no actual damages," she "was harmed by [ACS's] calls which she found aggravating, frustrating, harassing, and invasive." (PSMF ¶ 27.)

"Injury in fact is a constitutional requirement, and '[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (explaining that the "irreducible constitutional minimum" of standing consists of three elements: the plaintiff must have (1) suffered an injury in fact (2) that is fairly traceable to the challenged conduct of the defendant and that (3) is likely to be redressed by a favorable judicial decision). To establish injury in fact, a plaintiff must show that she suffered an "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).

In *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625 (3d Cir. 2017), the Third Circuit elucidated a rule for assessing the concreteness of harms involving conduct that violated statutes but that otherwise would not have given rise to a cause of action under common law: "When one sues under a statute alleging 'the very injury [the statute] is intended to prevent,' and the injury 'has a close relationship to a harm . . .

traditionally . . . providing a basis for a lawsuit in English or American courts,' a concrete injury has been pleaded." *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (quoting *In re Horizon*, 846 F.3d at 639–40). The Third Circuit has held that a single, prohibited prerecorded call from a cell phone is sufficient to constitute a concrete injury and thus confer standing to pursue a claim under the TCPA. *Susinno*, 862 F.3d at 351; *see also Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (finding two unwarranted text messages constituted a concrete injury under the TCPA, as they "present the precise harm and infringe the same privacy interests Congress sought to protect").

Here, Ms. Fleming claims that she received sixteen unwanted calls from ACS. (PSMF ¶¶ 19, 47) Under the TCPA, she has standing to sue based on those calls. Such calls fall within the prohibitory scope of the TCPA, which elevates them to the category of previously recognized injuries to privacy rights. *Susinno*, 862 F.3d at 352 ("[W]hen Congress found that unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients, it sought to protect the same interests implicated in the traditional common law cause of action."); *see also Van Patten*, 847 F.3d at 1043 (9th Cir. 2017) ("A plaintiff alleging a violation under the TCPA need not allege any *additional* harm beyond the one Congress has identified." (internal quotations omitted)). Even while conceding no "actual" injury, whatever that may have meant, Ms. Fleming continued to maintain that she found these calls to be "aggravating, annoying, frustrating, harassing, and invasive." (PSMF ¶¶ 27, 58; DSMF ¶ 27.)

Under the FDCPA, too, those allegedly repeated and harassing calls are sufficient to raise a claim of concrete injury and confer standing. At least one court in this District has so held on similar facts:

> Plaintiff's alleged injury stems from Defendant's failure to disclose its identity in a voice message left on Plaintiff's cellphone. Plaintiff alleges that such a failure to disclose is a violation of her statutory rights under the FDCPA. Indeed, while this alleged injury may not have resulted in any economic or physical harm, Plaintiff,

nonetheless, suffered a concrete injury because the alleged deprivation of Plaintiff's right to receive the statutorily mandated disclosures is 'not hypothetical' or 'conjectural.' Rather, it is a real harm that Congress has elevated to the status of a legally cognizable injury through the FDCPA.

*Pisarz v. GC Servs. Ltd. Partnership*, No. 16-4552, 2017 WL 1102636, at *6 (D.N.J. Mar. 24, 2017).

Ms. Fleming may pursue causes of action under the TCPA and FDCPA. She has alleged injuries sufficient to establish standing to assert claims under those statutes.

### c. Autodialer and Predictive Dialing

Ms. Fleming alleges that ACS used an unlawful "automatic telephone dialing system" ("ATDS")[4] to contact her on her cell phone, in violation of the TCPA. (Cplt. ¶ 19) I find that the evidence fails to raise a triable issue that ACS's LiveVox HCI system is an ATDS for purposes of the TCPA. I therefore will grant ACS's motion for summary judgment on this issue.

The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any . . . cellular telephone service . . . unless such call is made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii). The U.S. Court of Appeals for the Third Circuit has construed the term "automatic telephone dialing system" to mean "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1); *see also Dominguez v. Yahoo, Inc.* ("*Dominguez I*"), 629 F. App'x 369, 371-72 (3d Cir. 2015) (noting that the statute's reference to a "random or sequential number generator" was initially understood in relation to telemarketers' use of autodialing equipment that either called numbers in large sequential blocks or

---

[4] The parties, as well as the FCC and many of the cases, use the statutory term "ATDS" and the common term "autodialer" interchangeably.

dialed random 10-digit strings, but that this interpretation changed as such technology evolved and dialing from stored databases of numbers became more cost effective). ACS states that Ms. Fleming has failed to produce any evidence that she received a phone call made using an ATDS. (Def. Br. at 12–13) And in fact, says ACS, the LiveVox HCI system it employs is not an autodialer under the TCPA, cannot be modified to act as an autodialer, and does not have the capacity to dial numbers without human intervention. (*Id.* at 13.)

Ms. Fleming is not alleging that the LiveVox HCI system can dial randomly generated or sequentially generated numbers. (DSMF ¶ 36; *see* PSMF ¶ 36 (stating that this fact is irrelevant).) Instead, Ms. Fleming defines an ATDS to include "(1) Any equipment that has the capacity to dial calls from stored lists without human intervention at the point of dialing whether or not it is actually used to do so when a particular call is placed; OR (2) has the capacity to dial calls from stored lists without meaningful human intervention as determined on a case by case basis." Under that definition, says Ms. Fleming, there is a material dispute of fact as to whether the LiveVox HCI system is an ATDS. (Pl. Opp. at 11 (citing *Meyer v. Portfolio Recovery Associates,* 707 F.3d 1036, 1043 (9th Cir. 2012).) In particular, Ms. Fleming alleges that ACS's LiveVox "placed its calls off of a stored list that was uploaded and then dialed" (PSMF ¶ 36), and therefore qualifies as a prohibited "predictive dialer."

Predictive dialers are "dialing systems that 'store pre-programmed numbers or receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call centers.'" *Dominguez v. Yahoo!, Inc.,* 2017 WL 390267, at 4 (E.D. Pa. Jan. 27, 2017). In 2003, the Federal Communications Commission ("FCC") determined that such predictive dialer systems fell within the definition of an ATDS. *Id.* (citing *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* ("2003 FCC Order"), 18 FCC Rcd. 14014, 14090–94, ¶¶ 130, 133 and *id.* at 14022 n. 31 (noting that a predictive dialer is "an automated dialing system that uses a complex set of algorithms to automatically dial consumers'

telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call")). In 2015, the FCC reiterated that predictive dialers satisfied the statutory definition of an "ATDS," and added a further refinement: A system's capacity to function as an autodialer was "not limited to its current configuration but also includes its potential functionalities." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* ("2015 FCC Declaratory Ruling"), 30 FCC Rcd. 7961, 7971–72, 7974, ¶¶ 10, 16 (2015), *set aside in part by ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018). In other words, the 2015 FCC Declaratory Ruling held that predictive dialers were still a form of an ATDS, but expanded the definition to include systems that could *potentially* engage in this type of dialing.

The legal force of those two FCC orders has come into question recently. In construing the 2015 FCC Declaratory Ruling, the Third Circuit initially upheld it and determined that if an ATDS has the latent capacity to place autodialed calls, the statutory definition is satisfied. *Dominguez I*, 629 F. App'x at 372 ("But importantly, in [the 2015 FCC Declaratory Ruling] the FCC also clarified that neither 'present ability' nor the use of a single piece of equipment is required. Thus, so long as the equipment is part of a 'system' that has the latent 'capacity' to place autodialed calls, the statutory definition is satisfied.").

The Court of Appeals for the District of Columbia Circuit, however, expressed a different view. It set aside the 2015 FCC Declaratory Ruling, finding the "capacity" interpretation to be impermissibly expansive. The D.C. Circuit noted, for example, that virtually any smartphone would fall within the definition of an ATDS, because, through the downloading of an app, it could be converted to dial automatically. *ACA International*, 885 F.3d at 700.

Recognizing the import of the D.C. Circuit's decision, the Third Circuit revisited the issue and reverted to the statutory definition of autodialer that had governed before the issuance of the 2015 FCC Declaratory Ruling. *Dominguez on Behalf of Himself v. Yahoo, Inc.* ("*Dominguez II*"), 894 F.3d 116,

119 (3d Cir. 2018).[5] Under *Dominguez II*, then, what makes a device an ATDS is not its "latent or potential capacity to function as an autodialer," but its "present capacity to function as [an] autodialer." *Id.*[6]; *see also King v. Time Warner Cable Inc.*, No. 15-2474, 2018 WL 3188716, at *7 (2d Cir. June 29, 2018) ("In sum, we conclude that the term 'capacity' in the TCPA's definition of a qualifying autodialer should be interpreted to refer to a device's current functions, absent any modifications to the device's hardware or software.").

Both the Third Circuit and the D.C. Circuit, then, have now set aside the 2015 FCC Declaratory Ruling regarding mere "capacity" to autodial. What *Dominguez II* and *ACA International* left unaddressed, however, is the status of the previous 2003 FCC Declaratory Ruling and another order entered in 2008[7]

---

[5]    *Dominguez II* had not been handed down when the parties in this case submitted their summary judgment briefs. Both sides submitted supplemental letters, however, notifying the court of *Dominguez II* and discussing its impact on the issues in this motion. (ECF nos. 33, 34.) Ms. Fleming's letter argues that the decision in *Dominguez II* does not affect her argument that "LiveVox HCI is a component of a larger set or suite of systems that work together to form one dialing system that can be used either to make calls with an HCI mode or with a predictive mode that uses a 'predictive dialer' that automatically dials calls as programmed off a stored list." (ECF no. 35 (Letter), at 2.) She also argues that the 2003 and 2008 FCC Orders are still valid after *ACA International* and that prior to the 2015 FCC Declaratory Ruling predictive dialers were a form of an ATDS. (Id. at 2–3.) ACS instead focuses on the "present capacity to generate random or sequential numbers and dial them" aspect of the decision and states that there is no dispute as to the lack of a present capacity of the LiveVox HCI system to generate random or sequential numbers and dial them. (ECF nos. 33, 34 (Letters).)

[6]    The Third Circuit also discussed the kind of evidence that might establish whether a system has the present capacity to function as an ATDS. In *Dominguez II* it held that the expert reports in the record did not present a triable issue of fact regarding the "present capacity" of the system to function as an autodialer because the reports were "founded upon the exact type of hypothesizing that is foreclosed by *ACA International.*" An explanation was absent, said the Third Circuit, as to "how the Email SMS System *actually* did or could generate random telephone numbers to dial." *Id.* at 120 (affirming the exclusion of the expert reports and granting of summary judgment in favor of the defendant) (emphasis added). While Ms. Fleming does not rely on expert reports in describing the functionality of the LiveVox HCI system, she does rely heavily on evidence as to how the LiveVox HCI system could have functioned, as opposed to how it actually functioned.

[7]    *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* ("2008 FCC Order"), 23 FCC Rcd. 559, 566 (2008).

which held that predictive dialers fall within the prohibition of the statute. The D.C. Circuit touched on but did not decide that issue. *See ACA International*, 885 F.3d at 701-03 (discussing the Commission's seeming ambivalence as to whether an ATDS includes a device that lacks the capacity to generate random numbers, but dials calls from a database of telephone numbers generated elsewhere.). The Third Circuit did not really deal with it at all. *See Dominguez II*, 894 F.3d at 119 (noting that the definition reverted back to the standard before the 2015 FCC Declaratory Ruling but not explaining whether the "predictive dialing" system aspects of the previous orders still held).[8]

District courts, so far, have not been consistent as to whether *ACC International*, in rolling back the 2015 FCC Declaratory Ruling, left the 2003 and 2008 FCC Orders intact—*i.e.,* whether predictive dialers remain impermissible under the statute. *See Pinkus v. Sirius XM Radio, Inc.,* — F. Supp. 3d —, 2018 WL 3586186, at *5 (N.D. Ill. July 26, 2018) ("[M]ost district courts considering the question have held that *ACA International* vacated only the 2015 Declaratory Ruling—and therefore that courts remain bound by the FCC's rulings in the 2003 Order and 2008 Declaratory Ruling that a predictive dialer need not have the capacity to 'generate random or sequential numbers to be dialed' to qualify as an ATDS. This court respectfully takes a different view, holding that *ACA International* necessarily invalidated the 2003 Order and 2008 Declaratory Ruling . . . ." (citations omitted)). *See also Gary v. TrueBlue, Inc.,* No. 17-10544, 2018 WL 3647046, at *6 (E.D. Mich. Aug. 1, 2018) ("Applying *ACA Int'l,* the FCC's rulings—including the ATDS definition which

---

[8]     Ms. Fleming argues that "the Court was clear that it was not invalidating the prior case law and FCC orders" when it stated that it would "interpret the statutory definition of an autodialer as [it] did prior to the issuance of the 2015 Declaratory Ruling." (ECF no. 35, at 3 (citing *Dominguez II,* 894 F.3d at 119). What *Dominguez II* was unquestionably clear about was that the law regarding present versus latent capacity was reverting to its pre-2015 Declaratory Ruling interpretation. However, *Dominguez II* was silent on the issue of "predictive dialers" and did not address *ACA International's* unease with the FCC's decisions on predictive dialing. The Third Circuit did not have to deal with this issue because the alleged ATDS in *Dominguez II* was a text-messaging system which was not alleged to be a predictive dialing system at all.

covered equipment that can only dial numbers from a set list—are no longer valid."); *O'Shea v. Am. Solar Solution, Inc.*, No. 14-894, 2018 WL 3217735, at *2 (S.D. Cal. July 2, 2018) ("The *ACA* decision left intact the holding of both the FCC's 2003 and 2008 Order that an autodialer is an ATDS."); *Swaney v. Regions Bank*, No. 13-544, 2018 WL 2316452, at * 1 (N.D. Ala. 2018); *Sessions v. Barclays Bank Delaware*, No. 17-1600, 2018 WL 3134439, at *4–*5 (N.D. Ga. June 25, 2018) ("As a result [of *ACA International*], the Court finds that the FCC's prior orders with regard to interpretations of 'capacity' and descriptions of the statutorily enumerated functions a device must perform to be an ATDS were vacated in *ACA International*."); *Herrick v. GoDaddy.com LLC*, No. 16-254, 2018 WL 2229131, at *8 (D. Ariz. May 14, 2018) ("[I]n light of the *ACA Int'l* decision, this Court declines to apply such a broad interpretation of this function. Broadening the definition of an ATDS to include any equipment that merely stores or produces telephone numbers in a database would improperly render the limiting phrase 'using a random or sequential number generator' superfluous."); *Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077, 2018 WL 2220417, at *11 (S.D. Fla. May 14, 2018) ("So the *ACA International* case has given the Court considerable pause. But the Court finds that the prior FCC Orders are still binding. Therefore, the *ACA International* case does not change the Court's conclusion on the ATDS issue. . . . BCA Financial reads too much into *ACA International* when it concludes that the prior FCC orders can no longer be relied upon.").

While recognizing the disparate views in the case law, I am convinced by the reasoning in *Pinkus* and similar decisions. I hold that when the D.C. Circuit vacated the 2015 FCC Declaratory Ruling it also necessarily set aside the parts of the previous 2003 and 2008 FCC Orders that ruled that a predictive dialer was impermissible under the TCPA.

If *ACA International* was not quite explicit on the point, it was probably because it did not need to explore such implications in order to deal with the issue before it, *i.e.*, the validity or not of the 2015 FCC Declaratory Ruling. It

was enough, said the D.C. Circuit, to find that the agency had been inconsistent and had therefore failed to discharge its duty of reasoned decisionmaking:

> A basic question raised by the statutory definition is whether a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed. Or is it enough if the device can call from a database of telephone numbers generated elsewhere? The Commission's ruling appears to be of two minds on the issue.

> In certain respects, the order conveys that equipment needs to have the ability to generate random or sequential numbers that it can then dial. The order twice states that, to "meet[ ] the TCPA's definition of 'autodialer,'" the equipment in question must have the capacity to "dial random or sequential numbers." 2015 Declaratory Ruling, 30 FCC Rcd. at 7972 ¶ 10; see also *id*. at 7974 ¶ 15. And it is clear from context that the order treats the ability to "dial random or sequential numbers" as the ability to generate and then dial "random or sequential numbers."

> . . .

> So which is it: does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it lacks that capacity? The 2015 ruling, while speaking to the question in several ways, gives no clear answer (and in fact seems to give both answers). It might be permissible for the Commission to adopt either interpretation. But the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order.

*ACA International*, 885 F.3d at 701-03.

Still, to the *Pinkus* court—and I agree—the implications for the earlier orders are clear. After a deep analysis of the 2003 and 2008 FCC Orders and the reasoning of *ACA International, Pinkus* held that the "2003 Order—just like the 2015 Declaratory Ruling—elsewhere 'made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS'"—a flaw analogous to the one that doomed the 2015 Ruling. *Pinkus* noted, correctly, that the D.C. Circuit was concerned with the "lack of clarity" in the 2015 FCC

Declaratory Ruling as to what functions qualify a device as an autodialer; it reasoned that the same concern applies "with equal force" to the earlier 2003 and 2008 Orders. *Id.*

This makes sense; the FCC's Orders *are* confusing—at times seeming to require that a prohibited device possess the capacity to generate random or sequential numbers, but elsewhere prohibiting devices that lack that capacity. And indeed *ACA International,* in noting the inconsistency in the 2015 Ruling, explicitly traced it back to the 2003 FCC Order:

> While the 2015 ruling indicates in certain places that a device must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer, it also suggests a competing view: that equipment can meet the statutory definition even if it lacks that capacity. The Commission reaffirmed its 2003 ruling insofar as that order had found predictive dialers to qualify as ATDSs. 2015 Declaratory Ruling, 30 FCC Rcd. at 7972-73 ¶¶ 12-14. And in the 2003 order, the Commission had made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS. 2003 Order, 18 FCC Rcd. at 14,091 ¶ 131 n.432; *id.* at 14,093 ¶ 133.

*ACA International,* 885 F.3d at 702. The *ACA International* discussion is permeated with the notion that the 2015 Ruling is an elaboration of the earlier 2003 and 2008 Orders, and that the appeal of the 2015 Ruling may encompass its reaffirmation of the earlier Orders, even though those Orders had not themselves been appealed. *Id.* at 700–01.

I therefore adopt the holding of *Pinkus* that "*ACA International* necessarily invalidated the 2003 Order and 2008 Declaratory Ruling insofar as they provide, as did the 2015 Declaratory Ruling, that a predictive dialer qualifies as an ATDS even if it does not have the capacity to generate phone numbers randomly or sequentially and then to dial them." 2018 WL 3586186, at *6.

In light of that invalidation, I lack a binding agency determination as to whether predictive dialers that dial numbers from a list qualify as an ATDS. I

must therefore look to the statute and its language to make an independent determination as to whether such systems are disallowed under the TCPA. *See generally POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2236 (2014) (In a statutory interpretation case, "[a]nalysis of the statutory text, aided by established principles of interpretation, controls.").

The TCPA explicitly defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Does a system that dials numbers from a list that was not randomly or sequentially generated when the list was created qualify as an ATDS? With only the statutory text to guide me, I am convinced that the answer is no.

The phrase "using a random or sequential number generator," I believe, applies to the manner in which the numbers make their way onto the list—not to the manner in which the numbers are dialed once they are on the list:

> Because the phrase 'using a random or sequential number generator' refers to the kinds of 'telephone numbers to be called' that an ATDS must have the capacity to store or produce, it follows that that phrase is best understood to describe the process by which those numbers are generated in the first place. . . . As a result, were the phrase 'using a random or sequential number generator' understood to refer to how numbers are called rather than to how they are generated, it would be superfluous, as it would simply encompass the universe of possible orders in which numbers could be dialed [from a set list].

*Pinkus*, 2018 WL 3586186, at *8. [9] *See also Dominguez I*, 629 F. App'x at 372 (noting that "random or sequential" number generation refers to the numbers themselves rather than the manner in which they are dialed).

___

[9] The court in *Pinkus* explained further:

But what kinds of numbers [is the TCPA referring to]? Given its placement immediately after 'telephone numbers to be called,' the phrase 'using a random or sequential number generator' is best read to modify 'telephone numbers to be called,' describing a quality of the numbers an ATDS must have the capacity to store or produce. Had Congress meant 'using a random or sequential number

18

The parties dispute the exact makeup of the LiveVox HCI system (*e.g.*, whether LiveVox HCI is distinct from the other systems employed by ACS.) (DSMF ¶ 33; PSMF ¶ 33) There is little or no dispute, however, over how the calls that Ms. Fleming received were made, or about the present capabilities of the system. Ms. Fleming's own account is that "[t]he Defendant places calls to debtors by creating a computer file of hundreds to thousands of *account numbers with phone numbers*, loading that into [] campaign database software . . . which use pre-programmed criteria to sort the phone numbers." (PSMF ¶ 48.) Nowhere does she allege that the numbers are being randomly or sequentially generated for placement onto that campaign database call list. The evidence presented in Ms. Fleming's statement of material facts describes a predictive dialing system; it does not describe a system which "store[s] or produce[s] telephone numbers to be called, using a random or sequential number generator" under the TCPA. I therefore find that ACS's LiveVox HCI system, as presented in this case, is merely a predictive dialer and not an ATDS under the TCPA.

Ms. Fleming also argues that the lack of "meaningful" human intervention in the LiveVox HCI system qualifies it as an ATDS. (Pl. Opp. at 15.) Factually, she has a point. The parties do not dispute that ACS's HCI system employs a clicker agent system, whereby the calls are initiated by a "click" from a person who is presented with a number for her to dial on a screen. (DSMF ¶ 34). No complex human agency or discretion is involved: "[T]he agent merely clicks from the bottom to the top through the list, can only stop clicking

---

generator' to modify the verbs 'store' and 'produce,' Congress would have placed the phrase immediately after those verbs and before 'telephone numbers to be called'—with subsection (a)(1)(A) reading, 'to store or produce, *using a random or sequential number generator*, telephone numbers to be called.' Indeed, it would be odd to read the phrase 'using a random or sequential number generator' as modifying 'store' and 'produce.' The comma separating 'using a random or sequential number generator' from the rest of subsection (a)(1)(A) makes it grammatically unlikely that the phrase modifies only 'produce' and not 'store,' and yet it is hard to see how a number generator could be used to 'store' telephone numbers. *Pinkus*, 2018 WL 3586186, at *8 (citations omitted).

numbers if he or she goes on break or logs out of the system altogether, the agent cannot decide to skip calling a number or to call a different number, and the system makes the call without a live person on the line, only transferring the call to a live agent if it detects a human being has answered the phone." (PSMF ¶ 31). What the parties dispute is whether the human intervention involved in ACS's LiveVox HCI system is so meaningless as to be equivalent to no human intervention at all. (*Compare* DSMF ¶ 34 (describing the clicker agent and closer agent system) *with* PSMF ¶ 34 (pointing to the clicker agent's lack of choice as showing the lack of any meaningful human intervention in the system).)

Preceding that interpretive dispute, however, is a legal one. The present state of the "human intervention" test is difficult to determine. The FCC in the 2015 Declaratory Ruling refused to "clarify[ ] that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention." 30 FCC Rcd. at 7976 ¶ 20. The D.C. Circuit in *ACA International* took issue with this aspect of the 2015 Declaratory Ruling. It noted that the FCC stated that "the 'basic function' of an autodialer is to dial numbers without human intervention, but a device might still qualify as an autodialer even if it cannot dial numbers without human intervention." *ACA International*, 885 F.3d at 703. These two seemingly inconsistent propositions, said the D.C. Circuit, were "difficult to square," and it therefore set aside this aspect of the 2015 Ruling as well. *Id.*

As in the case of predictive dialers, *ACA International* was not explicit about what remained of the "human intervention" test after this invalidation. Some courts have already interpreted *ACA International* and the FCC orders as still requiring a role for the "human intervention test." *See, e.g., Gary*, No. 17-10544, 2018 WL 3647046, at *7–*8 ("But even if the Court were to follow the FCC's now-vacated and broad classification of an ATDS, Plaintiff fails to show that [the system at issue] is an ATDS as a matter of law. An autodialer, as defined by the relevant FCC orders, must have the capacity to dial from a set

list without human intervention . . . . The FCC has stressed the importance of human intervention in evaluating whether a system is an autodialer, but the Commission has eschewed a per se 'human intervention test.'" (citations omitted)).[10]

Measuring the descriptions of the "clicker agent" system employed by ACS against the words of the statute, however, I find that Ms. Fleming has not sufficiently shown that the system is so lacking in human intervention that it would qualify as an ATDS. The "clicker agent"—a person—is the one who initiates the call; calls are never placed by completely automatic, electronic means. (DSMF ¶ 34; PSMF ¶ 34.) The parties dispute whether the interpolation of a "clicker agent" into a largely electronic system suffices to distinguish it from, *e.g.*, a system that uses a computer to dial numbers from a set list. Ms. Fleming relies heavily on the clicker agent's lack of discretion, and it is seemingly true that the agent cannot choose which number on the screen to call, and "cannot decide to skip calling a number or to call a different number."

---

[10]     ACS points to several pre-*ACA International* cases in which the court held that the HCI system, because of its level of human intervention, did not function as an ATDS under the TCPA. *See Smith v. Stellar Recovery Inc.*, No. 15-11717, 2017 WL 955128 (E.D. Mich. Mar. 13, 2017) (adopting the report and recommendation of the magistrate) ("Since the 'basic function' of an autodialer is the capacity to dial phone numbers 'without human intervention,' and the HCI system lacks that capacity, the HCI is not an autodialer."); *Pozo v. Stellar Recovery Collection Agency, Inc.*, No. 15-929, 2016 WL 7851415, at *6 (M.D. Fla. Sept. 2, 2016) (granting summary judgment in part and denying in part) ("In sum, because Stellar's HCI system required its representatives to manually dial all calls and was not capable of making any calls without human intervention, Stellar did not employ an autodialer."); *Schlusselberg v. Receivables Performance Management, LLC*, No. 15-7572, 2017 WL 2812884, at *4 (D.N.J. June 29, 2017) (granting summary judgment) (agreeing with *Pozo* and finding that the HCI system could not be considered an ATDS in that case); *Arora v. Transworld Systems, Inc.*, No. 15-4941, 2017 WL 3620742 (granting summary judgment) ("[T]he numbers are stored in a 'campaign database' on a LiveVox server and 'presented to the [clicker] agent' through a system component called an Automatic Call Distributor. Thus, every call made using the Human Call Initiator requires direct human intervention to initiate. Therefore, this Court, like the previous [c]ourts who have considered this technology, finds that Human Call Initiator system does not constitute an autodialer."). In that pre-*ACA* context, those courts have largely found the "clicker agent" system to be satisfactory under the TCPA. Recognizing that the regulatory background was shifted by *ACA,* I cannot give those cases great precedential weight, but consider the discussion therein for its persuasive value.

(PSMF ¶ 34.) This may seem like a minimal amount of "human intervention." It may also seem to pose many of the same dangers of harassment and annoyance as a computerized robocalling system. Still, without authoritative agency guidance, I am confined to the words of the statute, which is addressed to "equipment" that randomly generates or dials numbers. *See supra*. In short, ACS has found an effective workaround; Congress might amend the statute to ban this kind of system, or the FCC might possess the theoretical power to ban it, but neither has effectively done so. The action of the "clicker agent" (taking Ms. Fleming's factual description as true), constitutes enough "human intervention" to bring the system outside the statutory definition of an ATDS.

Because I find that Ms. Fleming has not sufficiently shown that ACS's LiveVox HCI system is an ATDS, I will grant ACS's motion for summary judgment in its favor as to Ms. Fleming's claims under the TCPA.

### d. FDCPA Claims

I turn to Ms. Fleming's FDCPA claims. As to Count II, asserted under 15 U.S.C. § 1692e (false and deceptive practices), ACS's motion for summary judgment is granted; as to Count I, asserted under 15 U.S.C. § 1692d (abusive debt collection practices), summary judgment is denied.

The FDCPA "prohibits 'debt collector[s]' from making false or misleading representations and from engaging in various abusive and unfair practices." *Heintz v. Jenkins*, 514 U.S. 291, 292 (1995). A plaintiff bringing an FDCPA claim must show that "(1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Jensen v. Pressler & Pressler*, 719 F.3d 413, 417 (3d Cir. 2015). The first three elements are not in dispute; Fleming is a consumer, ACS is a debt collector, and ACS was attempting to collect the debt. As to the fourth element—the debt collector's employment of means that violate the FDCPA—I bear in mind a broad interpretive principle: "Because the FDCPA is a remedial statute, the Third Circuit has construed its

language broadly so as to give effect to its purpose." *Grubb v. Green Tree Servicing, LLC*, No. 13-7421, 2017 WL 3191521, at *4 (D.N.J. July 27, 2017) (quoting *Brown v. Card Serv. Center*, 464 F.3d 450, 453 (3d Cir. 2006)). Any lender-debtor communications "should be analyzed from the perspective of the least sophisticated debtor." *Brown*, 464 F.3d at 454.

### 1. Count II (§ 1692e)

Under one of the provisions of the FDCPA, a debt collector "may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. This section provides a nonexclusive list of sixteen examples of prohibited conduct, but "because the list of the sixteen subsections is non-exhaustive, a debt collection practice can be a 'false, deceptive, or misleading' practice in violation of section 1692e even if it does not fall within any of the subsections." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426–27 (3d Cir. 2018) (citing *Lesher v. Law Offices of Mitchell N. Kay, PC*, 650 F.3d 993, 997 (3d Cir. 2011)). Nowhere in the record, however, does Ms. Fleming present any evidence of conduct by ACS that could fall into one of those sixteen subsections or that could be construed as "false, deceptive, or misleading."[11] She objects to the frequency or nature of the calls, but does not point to any misleading communication. ACS's communications with Ms. Fleming, as she herself describes them, do not "rise[] to the level of being materially deceptive, misleading, or false." *Levins v. Healthcare Revenue Recovery Grp. LLC*, No. 17-3330, 2018 WL 3999888, at *6 (3d Cir. Aug. 22, 2018).

I will therefore grant ACS's motion for summary judgment as to Count II of the Complaint, which alleges violations of § 1692e.

### 2. Count I (§ 1692d)

Under another provision of the FDCPA, a debt collector may not engage in "any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. §

---

[11]    Neither party addressed the allegations of Count II in its briefing.

1692d. One of the enumerated prohibited acts under that section is "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with the intent to annoy, abuse, or harass any person at the called number." 15 U.S.C. § 1692d(5). By its plain terms, this subsection of the statute reaches both answered and unanswered calls. *Id.* ("Causing a telephone to ring *or* engaging any person in telephone conversation . . . .") (emphasis added).

Over the course of about three months, Ms. Fleming received fifteen confirmed calls from ACS. That averages out to a little more than one per week, and it appears that there was never more than one call on any given day. (PSMF ¶ 47; DCSMF ¶ 47.) During one of these calls (the initial one occurring on September 15, 2015) is it undisputed that Ms. Fleming actually spoke to a human (the male representative and the female supervisor from ACS). (DSMF ¶¶ 13–14; PSMF ¶¶ 13–14.) The remaining, unanswered calls were placed by ACS after that September 15, 2015 call in which Ms. Fleming made very clear her dire financial situation and inability to pay the debt. Those calls were not answered by Ms. Fleming and no voicemail was left on her cellphone. (DSMF ¶¶ 22–23; PSMF ¶¶ 22–23.) The calls did not stop until Ms. Fleming obtained counsel, who sent a revocation-of-consent letter to ACS on December 7, 2015. (DSMF ¶ 26; PSMF ¶ 26.)

A second alleged call involving actual conversation is factually more hazy. Ms. Fleming states that such a call occurred. Although she is not sure of the date, she says that it was sometime after the September 15, 2015 call and before the cessation of calls in December 2015. In this second call, she states, she told the ACS representative her situation had not changed since the September 15, 2015 call and said that ACS should stop calling her. (DSMF ¶¶ 19–20; PSMF ¶¶ 19–20.) ACS denies that this second call occurred because it cannot be corroborated from ACS's phone records. It is possible that the records are erroneous or that one call was placed from a different facility; on

the other hand, ACS's denial might well be persuasive to a fact finder. The factual issue is disputed.[12]

ACS argues that these calls do not represent "[a] substantial volume of calls. . . or pattern of calls which could be conceived as annoying, abusing, or harassing." (Def. Br. at 17.) Ms. Fleming stressed that they must be understood in the context of the first call, in which she explained that she had lost her job and her home, that she was struggling to feed her children, had just got out of a domestic violence situation, and that she did not have any money to pay the debt. (PSMF ¶ 42; DCSMF ¶ 42.) She also alleges that she reasserted her inability to pay during a second call and told ACS to stop calling her. (DSMF ¶ 19; PSMF ¶ 19.) As to the completed call(s), Ms. Fleming does not offer evidence that any harassing or abusive *statements* were made. As for the uncompleted calls, no voicemails were left, so again their *content* cannot be called abusive or harassing. The § 1592d harassment claim must therefore rest on the calls' number, frequency, and context.

As to number and frequency, courts in various districts have found that a relatively small amount of calls, even unanswered ones, over a short period of time could constitute a violation of the FDCPA. *See, e.g., Carr v. NCO Fin. Syst., Inc.*, No. 11-2050, 2011 WL 6371899, at *1 (E.D. Pa. Dec. 20, 2011) (denying a

---

[12]      "[T]here is conflicting authority regarding whether a plaintiff establishes a genuine factual dispute as to the number of phone calls by introducing [her] own testimony when there are contradictory documentary phone records." *Black v. AFNI, Inc.*, No. 15-1176, 2018 WL 3546193, at *5 (D.N.J. July 23, 2018). *Compare Rush v. Portfolio Recovery Assocs. LLC*, 977 F. Supp. 2d 414, 430-31 & n.20 (D.N.J. 2013) (holding plaintiff's repeated statements under oath creates genuine factual dispute as to number of phone calls despite contrary phone records) *and Black*, 2018 WL 3546193 ("An FDCPA plaintiff will rarely be able to produce any evidence besides [her] own testimony if [she] believes the phone records are inaccurate. It would be inconsistent with the broad remedial purpose of the FDCPA to prohibit plaintiffs from presenting their testimony as to their version of events."), *with Derricotte v. Pressler & Pressler, LLP*, No. 10-1323, 2011 WL 2971540 at *3-*4 (D.N.J. July 19, 2011) (finding plaintiff's affidavit did not create genuine dispute in the face of contrary phone records). Under these circumstances (and particularly in light of the undisputed evidence of one other similar call and multiple uncompleted calls) I will not grant the defendant summary judgment on this basis.

motion to dismiss where the plaintiff alleged receiving "constant" and "continuous" calls "once every two, three, four, or five days" over an estimated period of thirty days, amounting to around nine calls); *Bruner v. AllianceOne Receivables Mgmt., Inc.*, No. 15-9726, 2017 WL 770993, at *3 (N.D. Ill. Feb. 28, 2017) (denying a motion to dismiss where plaintiff alleged at least eleven phone calls over the span of six weeks); *Jones v. Sw. Credit Sys.*, No. 17-487, 2017 WL 4736790, at *1, *3 (E.D. Pa. Oct. 18, 2017) (finding that evidence of ten calls over eighteen days created "a genuine dispute . . . as to whether Defendant intended to annoy, abuse, or harass Plaintiff" and therefore denying defendant's summary judgment motion); *Black*, 2018 WL 3546193 at *6 (collecting cases where "courts have held that a jury should determine whether a defendant acted with intent to harass by making frequent phone calls"); *but see Reed v. IC Sys., Inc.*, No. 15-279, 2017 WL 89047, at *5 (W.D. Pa. Jan. 10, 2017).

In this case, ACS called Ms. Fleming fifteen or sixteen times over the course of roughly three months. That is not an egregious total in comparison to some of the other cases that have found FDCPA violations. Nor do there seem to be aggravating factors, such as placement of calls outside of normal business hours. It is significant, however, that the calls all occurred after the September 15, 2015 conversation in which Ms. Fleming clearly expressed her inability to pay and personal hardships: "I am unemployed right now. I just got myself out of a domestic violence relationship. I fled and I have nothing. I don't have my own home, my own car. I have nothing. I don't have a job. It's me and my three kids and I live in somebody else's house. . . . So there's literally nothing that I can even give you. Everything is being put off. I mean I'm trying to get my life back together." (ECF no. 24-5, at pp. 105-07).

It was in the weeks following that conversation that ACS called Ms. Fleming fourteen or fifteen more times. It would be unduly formulaic to merely count the number of the calls without appreciating the full context. A reasonable fact finder could infer that ACS had the intent to harass or annoy

Ms. Fleming by continuing to call her after being made aware of her dire financial situation.

There is another disputed factual issue that may bear on the merits as well. Ms. Fleming testified that there was a second similar telephone conversation, in which she asked the representative to stop calling. The dates are imprecise, but this call, if established, could add weight to Ms. Fleming's contention that any further calls had no practical purpose and were therefore harassing. In that context, and mindful of the principle that the FDCPA is to be construed broadly, I find there is a genuine dispute of material fact as to whether ACS made those phone calls with the intent to harass, annoy, or abuse.

In candor, I must note that this evidence is very far from being one-sided in Ms. Fleming's favor. A jury could legitimately decline to find that one or two apparently respectful conversations should be treated as harassment simply because Ms. Fleming was not at home or did not answer on multiple other occasions. These uncompleted calls could simply be regarded as diligent attempts to contact a party who had made herself hard to reach. A jury could also disbelieve Ms. Fleming's testimony about the second call, which is not corroborated by phone records.

The issues, however, are triable. A summary judgment motion is designed only to weed out cases that are not viable, not to sort weak cases from strong ones. I will therefore deny ACS's motion for summary judgment as to Count I of the Complaint, which alleges violations of § 1692d.

### III. Conclusion

For the reasons set forth above, the defendant's motion (ECF no. 24) for summary judgment is GRANTED as to Count II (15 U.S.C. § 1692e, 1692e(5) & 1692e(10)) and Count III (TCPA) of the Complaint, but DENIED as to Count I (15 U.S.C. § 1692d & 1692d(5)). An appropriate order accompanies this Opinion.

Dated: September 21, 2018

**Kevin McNulty**
**United States District Judge**